UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                    :

HARINDER JEET SINGH,              :

                      *Plaintiff,*     :

                                :

       -*against*-             :

                                :       14 Civ. 10111 (PAC)

EXCEL SECURITY CORP., RXR 620  :
MASTER LEASE, LLC, RXR PROPERTY  :
MANAGEMENT LLC, SECURITAS     :       **OPINION & ORDER**
SECURITY SERVICES CORP., JOHN    :
DOES 1-5 and ABC CORPS. 1-5 (fictitious :
Names),                             :

                                :

                   *Defendants.*     :
-------------------------------------------------------------X

     Plaintiff Harinder Singh ("Singh" or "Plaintiff") brings this action *pro se* against RXR 620 Master Lease, LLC, RXR Property Management, LLC (collectively, "RXR"), and Securitas Security Services Corporation (collectively, "Defendants"[1]) alleging discrimination, retaliation, and conspiracy to deprive him of his civil rights in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1985. Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. The Court GRANTS Defendants' motion.

## BACKGROUND[2]

     Singh is an American citizen of Asian-Indian descent. Compl. ¶ 1, ECF No. 1. The

---

[1] The Court dismissed Defendant Excel Security Corp. from this action pursuant to Fed. R. Civ. P. 12(b)(5) on June 10, 2016. (Mem. & Order, ECF No. 58).

[2] Unless otherwise noted, the Court treats all facts recounted here as undisputed. To the extent that Plaintiff "disagrees" with them (*see* Pl.'s 56.1 Counterstatement, ECF No. 119), his disagreement is not supported (and indeed, is often contradicted) by evidence in the record. Thus, any alleged dispute as to these facts is not genuine.

allegations here arise from Singh's employment as a Fire Safety Director/Emergency Action Plan Director (FSD/EAPD) in a building located at 620 Avenue of the Americas in New York, New York (the "Building"). *See* Compl. ¶¶ 8–9. Singh began working at the Building in 2006, initially for a security company named Summit Security ("Summit"), (Schlossberg Decl. Ex. I, at 46:2–12, ECF No. 115), and then, beginning in August 2008, for Excel Security Incorporated ("Excel") (*Id.* at 44:4–18). In March 2012, Quality Protection Services ("QPS") took over security of the Building and Singh worked for QPS until August 2012. *Id.* at 42:9–25. During both the transitions from Summit to Excel and Excel to QPS, Singh was required to complete a new employment application to retain his position and did so. *Id.* at 43:2–10, 44:19–45:3.

RXR Master Lessee, LLC bought the Building from its previous owner, Newmark & Company Real Estate Inc. ("Newmark"), in December 2011 (ECF No. 115 Ex. E, at 18:20–25), and RXR Property Management LLC became the Building's manager (ECF No. 115 Ex. F, at 1). SEIU Local 32BJ (the "Union") is a tenant in the Building. ECF No. 115 Ex. E, at 45:24–25. The Union's lease with RXR stipulates that the Building maintain security personnel who are Union members. *Id.* at 45:24–46:4. In 2012, QPS had only a rider agreement with the Union, so the Union requested that RXR re-bid the Building's security contract. *Id.* at 46:4–7. Around July 2012, during the bidding process, RXR told bidders that the Building would keep "incumbents," presumably a reference to existing QPS security employees, but stated "there is a possibility that we need a new daytime FSD." Singh Decl. Ex. 18, ECF No. 120; *see also* ECF No. 115 Ex. K, at 20:17–25. The Building required an FSD because the Fire Department of New York requires buildings to have "an FSD on site if there are more than one hundred people in a commercial building." ECF No. 115 Ex. K, at 26:22–25.

RXR awarded Securitas Security Services USA ("Securitas") the security contract in early

August and directed Securitas to offer and assign full-time positions by September 1, 2012.  ECF No. 115 Ex. K, at 30:19–23, 32:24–33:4, 33:19–20; *see also* ECF No. 115 Ex. F, at 1.  In August 2012, Securitas Branch Manager, John Cullen, went to the Building and distributed information to QPS employees about how to apply to Securitas for available positions.  ECF No. 115 Ex. K, at 20:2–16.  The QPS employees were told that if they were interested in continuing to work at the Building, they would need to re-apply for their positions with Securitas by August 30, 2012.  ECF No. 115 Ex. D.

Meanwhile, Singh took a four-week vacation to India from August 13th through September 10, 2012.  ECF No. 115 Ex. I, at 49:2–15.  His vacation was approved by his QPS supervisor at the time, Francis Constable, and was also known to his colleague, Damon Lindsay, the then-Deputy FSD.  ECF No. 115 Ex. I, at 43:19–23; ECF No. 115 Ex. L; ECF No. 120 Ex. 3; ECF No. 120 Ex. 5.  Michael Catanzaro, an RXR employee and the Building's Chief Engineer/Building Manager, is also "pretty sure" Singh informed Catanzaro about his travel before he left.  ECF No. 120 Ex. 12, at 42:6–15.

Before leaving for India, Singh disabled his cell phone service to avoid incurring international charges.  ECF No. 115 Ex. I, at 64:16–65:17.  Singh knew before he left that there would likely be a change in the Building's security company, although he did not know exactly who the new company would be.  *Id.* at 50:7–53:25.  Singh also saw someone from Securitas in the Building before he left on vacation.  *Id.* at 53:7–14.  In late August 2012, Singh called Constable from a public phone booth in India.  *Id.* at 49:20–50:6, 65:18–25.  Constable told Singh that Securitas would be replacing QPS as the Building's security provider as of September 1, 2012.  ECF No. 120 Ex. 10, at 70:22–71:16, 74:10–17, 75:5–9.  Singh understood that as of September 1, 2012, Constable would not be in charge of the Building.  *Id.* at 75:5–9.  Yet Constable assured

3

Singh that his position would be available for him upon his return.  *Id.* at 74:18–23, 75:18–76:12.

Singh made no further efforts to reach out to anyone from Securitas or RXR while in India and failed to apply by the August 30th deadline.  *Id.* at 72:4–14, 76:24–77:10; ECF No. 115 Ex. K, at 30:13, 35:17–20, Ex. M, at 1.  In the meantime, Cullen noticed that Singh's application was missing and attempted to reach him using the number listed in RXR's Request for Proposal.  ECF No. 115 Ex. D, Ex. K, at 15:8–24, 25:3–10, 29:20–30:4.  Cullen was unable to get in touch with Singh, so Securitas gave the FSD/EAPD position to the only person who applied: Damon Lindsay.  ECF. No. 115 Ex. D, Ex. I, at 168:2–12, Ex. K, at 30:5–7, 31:12–17.

Singh returned from India on September 10, 2012.  ECF No. 115 Ex. I, at 69:17–18, 69:23–25.  He contacted Lindsay, who told Singh to contact Securitas about his job assignment status.  *Id.* at 72:15–73:17.  Singh spoke with someone at Securitas on September 11, 2012 and learned about the need to apply to Securitas for his position.  *Id.* at 77:11–22.  He then submitted an online application (which did not require him to disclose his race or national origin) and made an appointment for an in-person interview.  ECF No. 115 Ex. D; ECF No. 120 Ex. 10, at 78:12–80:5, 86:3–11.  Either that day or the next, Singh went to the Securitas branch for his interview.  ECF No. 120 Ex. 10, at 78:17–19, 79:17–80:5; ECF No. 115 Ex. D, Ex. K, at 35:17–36:11.  Cullen told Singh that Securitas had filled all positions at the Building (ECF No. 115 Ex. D, Ex. K, at 36:22–37:2), and Securitas Director William Dunn told Singh that he could not be placed at the Building because someone from RXR's upper management did not like him (ECF No. 120 Ex. 10, at 83:2–19).  Securitas claims that Cullen offered Singh comparable positions at other buildings (ECF No. 115 Ex. D, Ex. K, at 37:2–7, 63:2–17), which he rejected, but Singh does not recall whether Securitas offered him anything (ECF No. 120 Ex. 10, at 84:22–85:11).

Before Singh returned from India and submitted his application, RXR Portfolio Manager

Michael Aisner asked Securitas not to employ Singh at the Building.  ECF No. 120 Ex. 14, at

47:16–48:7, 49:9–12, 51:2–17.  He did not ask or direct Securitas to not hire Singh for any position

anywhere else, however.  *Id.* at 48:21–23.  On August 23, 2012, Aisner wrote Cullen, saying: "As

discussed, we want to promote Damon Lindsay to the supervisor position.  Mr. Sing [sic] is out on

a 6[-]week vacation and I don't know how you'll want to handle this when he returns."  ECF No.

120 Ex. 19.  Cullen replied: "I've already had the discussion with Damon and will find something

else for Mr. SINGH within our company upon his return."  *Id.*  Shortly after Singh went for his in-

person interview in September, Aisner received an inquiry regarding Singh from his colleague

Frank Pusinelli, also an RXR employee.  In an email dated September 13, 2012, Aisner provided

the following background information on Singh:

> In short . . . this guy was the security supervisor when we bought the building. We
> were unimpressed with his work and QPS wanted me to get rid of him. I was on the
> fence until he started calling me (and you) asking for more money. He then said
> that he wasn't going into the union and that it was unfair that everyone else was
> getting more money and he wasn't (keep in mind he got a raise when QPS took over
> in March).
>
> I had told Securitas when we awarded the contract that I wanted to make a change
> and that now was the time, especially since he felt so strongly about joining 32BJ.
> Singh left for a one[-]month vacation in July and turned off his cell phone. Securitas
> was unable to reach him to get him through the online application. When he came
> back . . . the ship left without him.
>
> He's a bad apple, but Securitas is going to place him in a comparable job. Just not
> with us. Singh called my cell phone 12 times within two hours yesterday and when
> we finally spoke he gave me the same story I'm sure he gave you. While I feel bad
> for the guy . . . he's simply not listening. There is a job waiting for him if he just
> shuts up and goes through the process.

ECF No. 120 Ex. 16.  Pusinelli replied that he left Aisner "a voicemail on this issue," to which

Aisner responded: "Yikes . . . thanks for the heads up.  Between him, the Halal guys that Bill had

me harass, and the Inflatable rat th[at] Jason asked me to stab . . . I might need a suburban building

to manage while I lay low."  ECF No. 120 Ex. 17.  Plaintiff contends that this is evidence of

Aisner's discriminatory animus against him (Pl's 56.1 Counterstatement 13), while Aisner says that Pusinelli's voicemail implied that Singh "might be coming after" him and that his remarks comparing the incident with Singh to two other incidents he had to deal with involving a noisy Halal food cart and a union protest were innocent, "jovial comment[s]." ECF No. 120 Ex. 14, at 95:4–98:12.

Alleged Retaliation

This case is not the first time Singh has complained of racial discrimination while working at the Building. In 2009, while he was working for Excel, Singh filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC Charge") against Excel. ECF No. 120 Ex. 4. At the time, Singh was Deputy FSD and alleged he was passed over for a promotion to FSD/EAPD on account of his race and national origin. *Id.* A year later, when an opening arose in April 2010, Excel promoted Singh to FSD/EAPD. ECF No. 115 Ex. I, at 45:6–15.

Singh has no evidence that Securitas knew about the EEOC Charge prior to September 2012 (*see id.* at 147:23–148:6), but believes RXR knew about it through Catanzaro, who had come to RXR from Newmark. *Id.* at 146:14–147:3. Singh reasons that Catanzaro must have known about the EEOC Charge because his former boss at Newmark, Albert Voci, knew about it. *See* ECF No. 120, Ex. 15. Catanzaro, however, states he did not learn about the EEOC Charge until 2014. ECF No. 115 Ex. N, at 23:17–25, 25:5–9. Likewise, Aisner states that he learned of the EEOC Charge through the deposition process in the instant case. ECF No. 115 Ex. E, at 52:4–19.

Procedural History

After Securitas failed to hire Singh for a position at the Building in September 2012, he filed a Charge of Discrimination with the EEOC against Securitas. *See* ECF No. 120 Ex. 25. The EEOC found reasonable cause to believe that Securitas retaliated against Singh and notified the

parties of its findings in a determination dated July 31, 2014.  *Id.*  Subsequent attempts to resolve Singh's grievances through Title VII's administrative process failed, and the EEOC issued a right-to-sue letter on September 24, 2014.  ECF No. 115 Ex. H.  Singh filed this lawsuit against the Defendants three months later, on December 24, 2014.  ECF No. 1.  After the close of discovery and an unsuccessful mediation attempt, the Defendants moved for summary judgment on all of Plaintiff's claims.  Def.'s Mot. Summ. J., ECF No. 112.

## DISCUSSION

Plaintiff's failure-to-promote claim is directed solely at Excel (Def.'s Reply 56.1 Statement ¶71, ECF No. 124; ECF No. 115 Ex. I, at 160:2–15).  Since Excel has been dismissed, the Court dismisses Count One.

Singh's complaint alleges that Securitas's failure to hire him was retaliation for filing the EEOC Charge, which was protected activity.  Compl. ¶¶ 61, 67.  He pleads no other claim of retaliation.[3]  Singh mentions throughout his *pro se* submissions that RXR retaliated against him by not resolving his complaints that he was not getting paid enough, which (he says) constituted an adverse employment action.  This claim lacks merit, chiefly because RXR was not Singh's "employer" for Title VII purposes.  *See* ECF No. 115 Ex. I, at 92:17–25.  Singh never worked for or applied to work for RXR, and the relationship between RXR and Securitas is that of contractor-independent contractor (Def.'s Reply 56.1 Statement ¶ 9); therefore, only Securitas is Singh's "employer" for purposes of this Title VII action.  *See Sowemimo v. D.A.O.R. Sec. Inc.*, 43 F. Supp. 2d 477, 490 (S.D.N.Y. 1999) (security guard's "employer" for Title VII action was private security firm, not the city's department of homeless shelters where the security guard worked); *Ofori-Awuku v. Epic Sec.*, No. 00 CIV. 1548 (AGS), 2001 WL 180054, at *5-6

---

[3] Although Singh is now proceeding *pro se*, counsel drafted and submitted his complaint.

(S.D.N.Y. Feb. 23, 2001) (security guard's "employer" for Title VII action was private security firm, not jewelry store).  Because Plaintiff has neither pleaded nor proved this wage-based retaliation claim, the Court need not address this claim any further.  The only retaliation claim before the court, then, is Plaintiff's retaliatory failure-to-hire claim.

Further, the Court construes both of Plaintiff's failure-to-hire claims as being alleged solely against Securitas.  Because RXR is not Singh's "employer" within the meaning of Title VII, and because Singh's failure-to-hire claims appear to be directed solely at Securitas, the Court construes Counts Two and Three as being directed solely against Securitas.  Thus, Counts Two and Three are dismissed as against RXR.  The Court discusses Counts Two and Three as against Securitas below, along with Plaintiff's conspiracy claim (Count Four), which is directed at both Securitas and RXR.

## I.      Summary Judgment Standard

Summary judgment is appropriate if, after drawing all reasonable inferences in favor of the nonmovant (*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The substantive law of the case identifies which facts are material: only those "facts that might affect the outcome of the suit under the governing law" are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Conversely, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  Mere metaphysical doubt concerning the material facts, then, will not defeat a motion for summary judgment.  *Id.*

Once the movant has made an initial showing that no genuine issue of material fact remains, the nonmovant may not refute that showing with "[c]onclusory allegations, conjecture, and speculation," *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotations omitted), but must instead present specific evidence in support of its contention that there is a genuine dispute as to material facts. Fed. R. Civ. P. 56(c). In a Title VII discrimination case, the specific question for the court ruling on a motion for summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, '[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993)) (alterations in original).  In a Title VII retaliation case, the specific question is whether the record evidence is sufficient to permit a rational finder of fact to conclude that the plaintiff's protected activity was a but-for cause of the adverse employment action taken against him.  *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 847 (2013).

The same standards apply when the litigant involved is *pro se*, but such a litigant is afforded "special solicitude" and his submissions are held "to less stringent standards than formal pleadings drafted by lawyers." *Espinoza v. N.Y.C. Dep't of Transp.*, 304 F. Supp. 3d 374, 383 (S.D.N.Y. 2018) (internal quotations and citations omitted).  Thus, the Court construes a *pro se* litigant's filings "liberally and interpret[s] them to raise the strongest arguments that they suggest." *Id.* (internal quotations and citation omitted).  Nevertheless, a party's *pro se* status "does not relieve [him] of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Id.* (internal quotations and citation omitted).

II.     **Failure to Hire (Discrimination)**

    **A.  Legal Standard**

Courts evaluating Title VII discrimination claims apply the three-step burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 792 (1973).  *See Robinson v. Time Warner, Inc.*, 92 F. Supp. 2d 318, 329 (S.D.N.Y. 2000).  Under the *McDonnell Douglas* framework, a plaintiff must first prove a *prima facie* case of discrimination.  *Id.*  The requirements for doing so are not onerous.  *Id.*  Then, the burden of production shifts to the defendant to "articulate a legitimate, non-discriminatory purpose for the adverse employment decision."  *Id.*  The burden of production then shifts back to the plaintiff, who must prove "*both* that [defendant's] [proffered] reason was false, *and* that discrimination was the real reason."  *Id.* (quoting *Hicks*, 509 U.S. at 515) (alterations in original).  The plaintiff bears the burden of persuasion at all times, however—it never shifts to the defendant.  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009).

In the failure-to-hire context, a plaintiff makes out his *prima facie* case under Title VII by demonstrating that: "(1) he is a member of a protected class, (2) he was qualified for the job for which he applied, (3) he was denied the job, and (4) the denial occurred under circumstances that give rise to an inference of invidious discrimination."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).  A plaintiff who has not demonstrated that he applied for an open position has not established a *prima facie* case of discrimination.  *See Morris v. Ales Grp. USA, Inc.*, No. 04 CV 8239 (PAC) (THK), 2007 WL 1893729, at *9 (S.D.N.Y. June 29, 2007); *see also Diaz v. City Univ. of N.Y.*, No. 13 CV 2038 (PAC) (MHD), 2014 WL 10417871, at *25 (S.D.N.Y. Nov. 10, 2014) (finding that plaintiff's own admission that the position he applied to had been filled the month prior "undercuts the plausibility of his explicit assumption that he was denied the [job]

for any reason that would trigger Title VII protection."), *adopted in part*, No. 13 CV 2038 (PAC) (MHD), 2015 WL 5577905 (S.D.N.Y. Sept. 22, 2015); *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006) ("[I]n the absence of a job application, there cannot be a failure-to-hire."); *Dow v. West*, No. 00 CV 0050E (SR), 2002 WL 31011882, at *3 (W.D.N.Y. Aug. 16, 2002).

### B. Analysis

Plaintiff's discriminatory failure-to-hire claim fails because he cannot make a *prima facie* showing that Securitas denied him the job of FSD/EAPD at the Building "under circumstances that give rise to an inference of invidious discrimination."  Based on his race and national origin, Plaintiff is a member of a protected class.  Plaintiff was also qualified for the job, given that he previously held the FSD/EAPD position at the Building for several years and maintained his certification, and besides, Cullen felt Plaintiff was qualified (ECF No. 115 Ex. K, at 39:12–16). Thus, Plaintiff has satisfied the first two elements of his *prima facie* case.  Additionally, Securitas did not hire Plaintiff for the FSD/EAPD position at the Building, satisfying the third element.  Plaintiff's claim founders on the fourth element, however.

First, implicit in the elements of the *prima facie* case is the requirement that the position for which Plaintiff applies be an open position.  One can hardly claim that he was discriminated against through a company's failure to hire him when he applies for a job that has already been filled; to hold otherwise would invite a flood of meritless claims.  Plaintiff did not apply for the FSD/EAPD position until after he returned from vacation on September 10, 2012; by that time, Securitas had already given that job to Lindsay, and all positions at the Building were filled. Thus, Plaintiff did not apply for an open position.

Second, the circumstances surrounding Plaintiff's rejection for the position do not give

rise to an inference of invidious discrimination.  Securitas did not give Plaintiff the FSD/EAPD

role because by the time he applied, Securitas had already given the job to Lindsay after

attempting to contact Plaintiff multiple times to gauge his interest in the job.  Moreover,

Securitas offered Plaintiff FSD/EAPD positions at comparable buildings (which Plaintiff

apparently declined), seriously undermining the notion that Securitas refused to hire Plaintiff

because of his race or national origin.  Further, Plaintiff has adduced no evidence that anyone at

Securitas was aware of his race and/or national origin or commented upon it.  The simple fact

that no other security personnel of Asian-Indian descent were employed at the Building does not

establish that Plaintiff was discriminated against; instead, he must show that he was treated

differently from others who were similarly situated.  Unfortunately for Plaintiff, he is not

similarly situated to the formerly-QPS employees who Securitas hired after the transition,

including Lindsay, because each of those people filled out a timely application when the

positions were open, while Plaintiff did not.  Plaintiff had been through this drill twice before,

when Excel replaced Summit and again when QPS replaced Excel, and both times Plaintiff

submitted applications for employment with the new companies and was hired when they took

over.  Yet even when he knew that another change in security companies was likely to happen,

Plaintiff turned off his phone's ability to receive international calls and went to India for a

month, rendering himself unreachable.  It is regrettable that Plaintiff relied on the assurances of

Francis Constable, a QPS employee, that his job would be waiting for him upon his return,

instead of calling Securitas from India.  Nonetheless, Constable was not authorized to speak for

the Defendants, and Plaintiff is responsible for his decision to rely on Constable's word.

Third, Plaintiff has adduced no evidence that anyone at RXR discriminated against him.[4] There is no evidence that anyone from RXR ever remarked on Plaintiff's race or national origin. A reasonable jury could find that Aisner did not like Plaintiff and did not want him working at the Building, but that does not constitute discrimination prohibited by Title VII, nor is Title VII an anti-personal vendetta statute. *Jones v. Associated Univs., Inc.*, 870 F. Supp. 1180, 1196 (E.D.N.Y. 1994) ("[T]he intentional discrimination requisite for Title VII liability does not exist where an employee is terminated because a supervisor has a personal vendetta against him, if such conduct does not stem from a statutorily proscribed reason.") (citing *Hicks*, 509 U.S. at 521); *see also Satterfield v. United Parcel Serv.*, No. 00 Civ. 7190 (MHD), 2003 WL 22251314, at *12 (S.D.N.Y. Sept. 30, 2003) ("[P]ersonality conflicts are beyond the purview of Title VII."). Aisner's email remarks regarding Plaintiff do not give rise to a Title VII claim because a reasonable jury could not interpret his statements as harboring a discriminatory animus, and no amount of disagreement can change that. Instead, it appears that Aisner was tired of Plaintiff's complaints regarding his wages and thought that Plaintiff was "a bad apple." Moreover, even if Aisner lied about Plaintiff's poor performance, as Plaintiff alleges, "Title VII is not a cause of action for perjury; we have other civil and criminal remedies for that." *Hicks*, 509 U.S. at 521.

Finally, even if Aisner did harbor discriminatory animus against Plaintiff, it would be irrelevant, because Aisner was not the decision-maker with regards to hiring Plaintiff to work at the Building. That decision belonged to Securitas, as the independent security contractor. But even if Securitas interpreted Aisner's request that Securitas not employ Singh at the Building as a demand, and felt pressure to please RXR, Plaintiff's claim would fail, because he lacks

---

[4] Even though the failure-to-hire claims are construed as solely against Securitas, the evidence regarding RXR is relevant to the extent that Aisner might have influenced Securitas's decision.

evidence that the ultimate decision maker—Securitas—relied on Aisner's statements in making

its decision. *See Lin v. N.Y. State Dep't of Labor*, No. 1:14-CV-0771 (LEK/DJS), 2017 WL

435811, at *8–*9 (N.D.N.Y. Feb. 1, 2017). To the contrary, Cullen attempted to contact Plaintiff

multiple times to see whether he was interested in working at the Building. It was only after

failing to reach Plaintiff that Securitas gave the FSD/EAPD job to Lindsay, the sole applicant.

Accordingly, the circumstances of Securitas's failure to hire Plaintiff cannot give rise to an

inference of invidious discrimination, even after the Court has construed all of Plaintiff's filings

liberally and drawn all inferences in his favor, and even though Plaintiff needs only a minimal

showing to establish his *prima facie* case. *See Jute v. Hamilton Sunstrand Corp.*, 420 F.3d 166,

173 (2d Cir. 2005).

Assuming *arguendo* that Plaintiff could make out a *prima facie* case of discrimination,

summary judgment would nonetheless be appropriate, because Plaintiff has not rebutted

Securitas's legitimate, nondiscriminatory reason for not hiring Plaintiff—namely, that he did not

apply for the job until after it was filled. *See Gautum v. Prudential Fin., Inc.*, No. 06–CV–3614

(JS) (AKT), 2008 WL 11417411, at *5 (E.D.N.Y. 2008) (finding plaintiff's unresponsiveness to

defendant's attempts to contact him about moving forward in hiring process a legitimate,

nondiscriminatory reason for not hiring plaintiff). The record shows that RXR rebid the

Building's security contract not to get rid of Plaintiff, but because the Union, a tenant in the

Building, asked it to. Securitas had a legal obligation to have an FSD/EAPD at the Building, and

a contractual obligation to fill that role by September 1, 2012. Securitas could not keep the

FSD/EAPD position open until Plaintiff's return and lacked any indication that he would even

apply for the job. Securitas's legitimate, nondiscriminatory reason for filling the FSD/EAPD

role in Plaintiff's absence would defeat Plaintiff's *prima facie* case if he could establish one, and

Plaintiff's bald assertion that this reason is "false, a lie and a pretext" (Pl.'s Counterstatement of Material Facts at 21) is simply insufficient to rebut Securitas's stated reason and defeat Defendants' summary judgment motion.

To rebut the stated reason, the factfinder would have to infer that Securitas knew Plaintiff's race and/or national origin without having met him or even received an employment application from him, and that his race and/or national origin was a substantial or motivating factor behind Securitas's decision to not hire Plaintiff at the Building. The record does not support these inferences, especially given the evidence that Securitas attempted to contact Plaintiff to invite his application and offered him other positions with Securitas when he eventually applied. And if Plaintiff has not rebutted Securitas's legitimate, nondiscriminatory reason for not hiring him, then by definition he cannot carry his ultimate burden of proving that discrimination was the true reason for why Securitas failed to hire him. Summary judgment on Count Two is, therefore, appropriate.

## III.    Failure to Hire (Retaliation)

### A.  Legal Standard

Whereas Title VII's "substantive [antidiscrimination] provision seeks to prevent injury to individuals based on who they are, *i.e.*, their status[,]  [t]he antiretaliation provision seeks to prevent harm to individuals based on what they do, *i.e.*, their conduct." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  Despite this conceptual difference, though, the procedure for analyzing retaliation claims is similar to that for analyzing discrimination claims.

As with discrimination claims, courts use the *McDonnell Douglas* framework to evaluate Title VII retaliation claims. *Jute*, 420 F.3d at 173.  To demonstrate a prima facie case of retaliation, the plaintiff "must show (1) participation in a protected activity; (2) that the

15

defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir. 2001)).  A failure to hire is an adverse employment action.  *See Hughes v. Twenty-First Century Fox, Inc.*, 304 F. Supp. 3d 429, 445 (S.D.N.Y. 2018).

As for the causal connection, "Title VII retaliation claims must be proved according to traditional principles of but-for causation."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).  Thus, the plaintiff must provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Id.* Accordingly, retaliation must be a "but-for" cause of the adverse action, not merely a "substantial" or "motivating" factor in the employer's decision.  *Id.* at 348.

If the plaintiff can establish his *prima facie* case, "a presumption of retaliation arises" and the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action.  *Jute*, 420 F.3d at 173.  If the defendant does so, the "presumption of retaliation . . . drops from the picture" and the burden of production shifts back to the plaintiff to "come forward with [evidence that the] non-retaliatory reason is a mere pretext for retaliation."  *Kwan*, 737 F.3d at 845.

**B.  Analysis**

Filing the EEOC Charge is protected activity, and Securitas's failure to hire Plaintiff as FSD/EAPD at the Building is an adverse employment action.[5]  Thus, Plaintiff has satisfied the

---

[5] The job constituting the basis for Singh's failure-to-hire claim is the FSD/EAPD position at the Building (and perhaps a deputy FSD position at the Building), not all positions with Securitas at all buildings it provides security to.  Thus, the fact that Securitas offered Plaintiff comparable jobs elsewhere, if true, is good evidence that it did not harbor discriminatory animus against

first and third elements of his *prima facie* case for retaliatory failure to hire.  But Plaintiff has no

evidence that Securitas knew of the protected activity, nor has he established a causal connection

between the EEOC Charge and Securitas's decision not to hire him as required for the second

and fourth elements, respectively.  Thus, Plaintiff cannot make out his *prima facie* case.

Plaintiff admits he has no evidence that Securitas was aware of the EEOC Charge, but

claims that Catanzaro and Aisner knew of the EEOC Charge and must have told Securitas about

it.  But Plaintiff has produced no evidence to support this claim, while Catanzaro and Aisner

have both sworn that they did not learn of the EEOC Charge until 2014, after Plaintiff filed this

case.  That Catanzaro's former boss, Albert Voci, at his prior job (Newmark) knew of the EEOC

Charge is too infirm a foundation from which to infer that Catanzaro knew about it and brought

that knowledge with him to RXR.  *See Robinson*, 92 F. Supp. 2d at 334–35 (describing the chain

of inferences necessary to show retaliation from a failure to hire as (1) prior employer knew

plaintiff had filed charges with the EEOC, (2) prospective employer knew about EEOC charge

because someone from prior employer must have told them, and (3) prospective employer based

its hiring decision on this knowledge, and concluding that the fact that only plaintiff and one

other who had filed an EEOC charge were not hired by prospective employer after outsourcing

was insufficient evidence to give rise to those inferences).

Similarly, Plaintiff has not adduced evidence from which a reasonable jury could

conclude that Securitas would have given Plaintiff the FSD/EAPD job but for the EEOC Charge.

If Securitas did not know of the EEOC Charge, then it could not have based its decision on the

EEOC Charge's existence.  No temporal proximity between the EEOC Charge and the decision

---

Plaintiff, but it does not mean that Securitas did not fail to hire Plaintiff such that he suffered no
adverse employment action.  *See* Def.'s Mot. Summ. J. 12, 17.

not to hire Plaintiff exists, either: Plaintiff filed the EEOC Charge against Securitas's predecessor's predecessor three years before he applied to Securitas.  Given this lapse of time and the significant evidence in the record establishing Securitas's nondiscriminatory reason for failing to hire Plaintiff, the mere facts that Plaintiff filed the EEOC Charge against Excel in 2009 and Securitas failed to hire him in 2012 do not establish the requisite causal connection between the protected activity and the later rejection.  *See Sulehria v. City of New York*, 670 F. Supp. 2d 288, 315 (S.D.N.Y. 2009) ("The passage of nearly two years between the protected activity and the adverse action is plainly far too long to offer adequate circumstantial evidence of causation to survive summary judgment."); *Schupbach v. Shineski*, 905 F. Supp. 2d 422, 436 (E.D.N.Y. 2012) ("[E]ven assuming that . . . [defendant] knew of plaintiff's EEO activity . . . the temporal proximity is too attenuated. In this case, approximately two years passed from when plaintiff filed her EEO complaint [to] . . . when she was not selected for the . . . position.").

As with his discriminatory failure-to-hire claim, Plaintiff has failed to make out a *prima facie* case of retaliatory failure to hire.  Likewise, even if he had, Plaintiff has not rebutted Securitas's legitimate, nondiscriminatory reason for not hiring him—namely, that Securitas did not hire Plaintiff at the Building because he failed to timely apply to an open position. Therefore, summary judgment is appropriate on Count Three as well.

## IV.   Conspiracy to Violate Plaintiff's Civil Rights

### A.  Legal Standard

A plaintiff claiming a violation of 42 U.S.C. § 1985(3) must prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any
> person or class of persons of equal protection of the laws, or of equal privileges and
> immunities under the laws; and (3) an act in furtherance of the conspiracy; (4)

whereby a person is either injured in [her] person or property or deprived of any

right of a citizen of the United States.

*Cater v. New York*, No. 17 Civ. 9032, 2019 WL 763538, at *5 (S.D.N.Y. Feb. 4, 2019) (quoting

*Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)) (alteration

in original).  "A conspiracy is an agreement between two or more individuals, where one

individual acts in furtherance of the objective of the conspiracy, and each member has

knowledge of the nature and scope of the agreement."  *Burrell v. City Univ. of N.Y.*, 995 F. Supp.

398, 414 (S.D.N.Y. 1998).  For § 1985(3), the conspiracy must also "be motivated by some

racial[,] or perhaps otherwise class-based, invidious discriminatory animus."  *Cater*, 2019 WL

763538, at *5 (quoting *Mian*, 7 F.3d at 1088).  Broad allegations and conclusory assertions of

conspiracy are insufficient to establish the existence of a conspiracy; rather, the plaintiff "must

provide some factual basis supporting a meeting of the minds."  *Id.* at *5–*6 (citation omitted).

Section 1985(3) does not create substantive rights or liabilities; instead, it is a remedial

statute.  *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979).  Accordingly,

a § 1985(3) conspiracy claim requires a predicate deprivation of legal rights created by the

Constitution or other laws.  *Ladson v. Ulltra E. Parking Corp.*, 853 F. Supp. 699, 704 (S.D.N.Y.

1994).  Title VII is not one of those laws.  "§ 1985(3) may not be invoked to redress violations of

Title VII," because allowing such claims would give complainants an opportunity to bypass the

detailed administrative scheme that Congress established to vindicate Title VII violations,

allowing them to bring their claims directly in district courts.  *Novotny*, 442 U.S. at 373–76, 378.

**B.  Analysis**

Here, Singh's claim under § 1985(3) fails as a matter of law, because his allegation that

the Defendants conspired to discriminate against him because of his protected status "as defined

by Title VII of the Civil Rights Act" (Compl. at ¶¶ 70–76) through failing to hire him is an attempt to vindicate his Title VII rights through § 1985(3)—something the law does not allow. On that ground alone, summary judgment on Count Four is appropriate.

But even if the Court could somehow look past this pleading defect, Plaintiff does not have evidence sufficient to persuade a reasonable jury to find the existence of a conspiracy to deprive him of his rights.  At best, a reasonable jury could conclude that Aisner disliked Singh, wanted him out of the Building, and tried to get Securitas not to hire him for the FSD/EAPD position at the Building, and that Cullen was ready to accede to that request if and when Plaintiff eventually applied for a position with Securitas.  But that would not constitute a conspiracy to deprive Plaintiff of his rights under the law, because he had no right to employment with Securitas.  Accordingly, summary judgment on Count Four is appropriate.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to close the motion at ECF No. 112 and close this case.

Dated: New York, New York
     March 30, 2021

SO ORDERED

_____
HONORABLE PAUL A. CROTTY
United States District Judge